# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

MARVIN HARDISON,           )
                                  )
                                  )
             Plaintiff,        )
                                  )
v.                               )        No.  05-CV-181-SAJ
                                  )
JO ANNE B. BARNHART,       )
Commissioner of Social Security     )
Administration,               )
                                  )
             Defendant.     )

### OPINION AND ORDER[1]

Pursuant to 42 U.S.C. § 405(g), Plaintiff appeals the decision of the Commissioner denying Social Security benefits.[2]  Plaintiff asserts that the Commissioner erred because (1) the ALJ erred in formulating Plaintiff's residual functional capacity but not including all of Plaintiff's physical limitations, and (2) the ALJ improperly evaluated Plaintiff's credibility. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

### I. FACTUAL AND PROCEDURAL HISTORY

Plaintiff was born June 2, 1963.  [R. at 51].  Plaintiff alleges disability beginning February 12, 1999. [R. at 51].  In his disability application Plaintiff indicated that he is six foot two inches tall and weighs 200 pounds.  [R. at 61].

---

[1]    This Order is entered in accordance with 28 U.S.C. § 636(c) and pursuant to the parties' Consent to Proceed Before United States Magistrate Judge.

[2]    Administrative Law Judge Lantz McClain (hereafter "ALJ") concluded that Plaintiff was not disabled by decision dated May 11, 2004.  [R. at 14 - 24].  Plaintiff appealed the decision by the ALJ to the Appeals Council. The Appeals Council declined Plaintiff's request for review on March 3, 2005.  [R. at 5].

Plaintiff asserts that he is disabled due to a back injury which causes neck pain and numbness in his legs and hands.  [R. at 62].  Plaintiff noted that he is unable to lift, bend or stand for long periods of time.  [R. at 62].

Plaintiff completed a disability interview outline form.  [R. at 104].  Plaintiff wrote that during an average day he took his medications and waited until they began to work.  [R. at 104].  Plaintiff indicated that he slept approximately two to four hours each night but that sometimes he slept six to eight hours.  [R. at 104].  Plaintiff noted that he was unable to sleep well.  [R. at 104].

Plaintiff reported living alone in a trailer house.  [R. at 104].  Plaintiff noted that he was unable to do much and was constantly angry at himself due to his pain and lack of abilities.  [R. at 105].  Plaintiff noted that he previously entertained and cooked for people and cleaned his own house, but that due to his pain and problems he is unable to do anything.  [R. at 106].  In his report Plaintiff wrote that due to his medication he does not believe that he should drive.  [R. at 108].

Plaintiff completed a pain questionnaire on June 4, 2003.  [R. at 110]. Plaintiff wrote that his normal daily activities were fairly limited and included doing what he could around his house.  [R. at 110].  Plaintiff wrote that he experienced shooting pain and numbness from the top of his head above his eye to his legs.  Plaintiff stated he has pain due to walking from a chair and going to use the bathroom.  [R. at 110].  In his medications list, Plaintiff noted that he took Oxycotin, Bacolfin, Hydrocodone and Ambien.  [R. at 111].

Plaintiff was treated by Randell L. Hendericks, M.D., from May 28, 1999, until August 7, 1999.  [R. at 166].  Upon examination on May 28, 1999, Plaintiff complained of low back and left leg pain and knee pain.  Plaintiff also noted neck pain, headaches, and bilateral

shoulder pain.  [R. at 171].  The doctor recommended cervical and lumbar MRI's to better assess Plaintiff's pain.

On August 27, 1999, Dr. Hendricks noted that he had reviewed the lumbar and cervical MRIs and did not see a ruptured disc nor any pressure on the neurologic structures.  Plaintiff complained of severe primarily low back pain and secondary neck pain. The doctor interpreted the MRIs as benign.  [R. at 167].  "The patient's subjective complaints seem just a bit more than one would anticipate given the exam and diagnostic studies."  [R. at 167].

On October 27, 1999, Dr. Hendricks indicated that Plaintiff had no neuruologic deficits on exam and could return to full and gainful employment.  [R. at 168].

Plaintiff was treated from December 8, 1999 until June 8, 2000, by Mark S. Adams, M.D.  [R. at 180].  Plaintiff's initial examination was on December 8, 1999.  [R. at 188]. Plaintiff was described as walking with a stiff back, and having problems with forward flexion and bending.  Plaintiff had some pain raising his right leg.  Motor testing revealed good strength with encroachment.  [R. at 189].

On February 3, 2000, Plaintiff indicated his pain was so intense that he was unable to pick up a coffee can of feed for his horses.  [R. at 183].  Plaintiff agreed to proceed with surgery.  [R. at 183].  Plaintiff had surgery on April 17, 2000, and was discharged on April 20, 2000.  [R. at 193].

Two weeks after his fusion, on May 4, 2000, Plaintiff reported walking at home and using a walker for balance.  [R. at 182].  Motor testing of lower extremities revealed 5/5 strength.  [R. at 182].  On June 8, 2000, Plaintiff was in for follow-up of his back fusion (six weeks post fusion).  Plaintiff's wound was described as well healed, and Plaintiff stated he

was doing okay with the exception of falling down some steps at his house and resulting pain.  [R. at 181].  Plaintiff was to wean himself from his brace and return for a visit in one month, at which point the doctor noted "I hope we can liberalize his activities."  [R. at 181].

Plaintiff was treated from July 17, 2000 until October 24, 2002 by Eric W. Sherburn, M.D.  [R. at 205].  On August 24, 2000, Plaintiff indicated he was "doing okay although he still suffered from significant muscle spasms."  [R. at 212].  Plaintiff continued to require OxyContin and Flexeril.  The doctor concluded that, overall, Plaintiff was doing well.  [R. at 212].  On April 24, 2001, Dr. Sherburn noted that Plaintiff continued to require narcotic pain medication for low back pain and that, in his opinion, it was time to have the bone growth stimulator removed.

On October 9, 2001, Dr. Sherburn recommended that Plaintiff undergo a functional capacity evaluation because he did not believe that Plaintiff could continue the hard manual labor that he had previously performed.  [R. at 209].  The doctor also recommended ongoing pain management to reduce his dependence on narcotics.  [R. at 209].

On May 14, 2002, Plaintiff indicated that he had received some injections from Dr. Revelis which had assisted with Plaintiff's pain.  Plaintiff additionally requested additional physical therapy.  [R. at 207].

On October 24, 2002, Plaintiff was four months post hardware removal following an L4-5 fusion.  Plaintiff indicated that the hardware removal had helped him and he was not as adversely affected by cold weather.  Plaintiff did continue to complain of intractable back pain.  Dr. Sherburn noted that, overall, Plaintiff was doing satisfactorily.  The doctor wanted Plaintiff to have a course of physical therapy, but believed that Plaintiff had obtained maximum medical improvement and would be released from his care.  [R. at 206].

-- 4 --

Plaintiff was examined by Gary R. Lee, M.D., on January 3, 2002.  [R. at 216].
Plaintiff reported present pain.  [R. at 217].  Plaintiff had some decreased range-of-motion
of his lumbar spine.  [R. at 217].  Plaintiff's upper and lower extremities were reported within
normal limits.  [R. at 218].  Dr. Lee concluded that Plaintiff sustained a work-related injury
on February 12, 1999 and had reached maximum medical improvement.  [R. at 218].  The
doctor concluded that Plaintiff had a zero percent impairment to the whole man as
contributed by the cervical spine,  right and left shoulder, right and left hand, right and left
arm, right ribs, right and left foot and right and left leg.  The doctor found a 14 percent
whole man impairment based upon surgical treatment.  [R. at 218].  The doctor concluded
that Plaintiff had a 21 percent whole man impairment, with nine percent related to prior
work injuries.  [R. at 219].

Plaintiff was examined by Jim C. Martin, M.D., on February 14, 2003.  [R. at 222].
He noted that he had previously evaluated Plaintiff, that Plaintiff had been treated for
chronic pain by Dr. Revelis and undergone six sacroiliac joint injections and had numerous
medications and physical therapy regimens.  [R. at 222].  Plaintiff complained of pain in his
neck radiating to his shoulder blade areas bilaterally.  [R. at 222].  Plaintiff complained of
stiffness over his mid and low back with severe pain radiating into his left hip and leg.  [R.
at 222].  Plaintiff complained of depression and numbness from the medications to relieve
the pain.  [R. at 223].  Plaintiff had a normal range-of-motion of his shoulders but was
restricted with regard to his neck.  [R. at 223].  Plaintiff had back spasms.  The doctor
concluded that as a result of his February 12, 1999 accident, Plaintiff sustained an injury
to the neck, a fracture of five ribs, disc pathology at L4-5 which required insertion of a bone
growth stimulator and a second surgery, residual tenosynovitis and nerve injury to the

knee, chronic pain syndrome, and post-traumatic psychological overlay causing depressive episodes.  The doctor concluded that Plaintiff had a net of 67% impairment to the whole person as a result of his back injury.  [R. at 225].  This doctor had previously examined Plaintiff on November 7, 2001, finding him to be temporarily totally disabled pending treatment.  [R. at 227].  The doctor had also examined Plaintiff on October 1, 1999, finding a temporary total disability pending treatment.  [R. at 231].

On June 27, 2003, a social security examiner noted a telephone contact with Plaintiff.  The examiner noted that Plaintiff had not seen a doctor since January 21, 2003, and that Plaintiff at that time signed a contract with Dr. Revelis that Plaintiff would not visit another doctor unless Plaintiff was referred by Dr. Revelis.  According to Plaintiff, the reason for the contract was that Dr. Revelis did not want Plaintiff to double up on his pain medications.  [R. at 113].  To renew his prescriptions, Plaintiff contacts Dr. Revelis' office and the office calls his prescription into the pharmacy.  [R. at 113].

Plaintiff was admitted June 6, 2001 and discharged June 8, 2001, for a L4-5 fusion with painful hardware syndrome.  Notes indicate that Plaintiff previously had a lumbar interbody fusion and was believed to have a painful hardware syndrome and was presenting for removal of the hardware.  [R. at 128].  Plaintiff was instructed, on discharge, to maintain his medications (OxyContin, Lortab, and Soma) and was to maintain light activity with no bending or lifting.  [R. at 129].

At Tulsa Pain Consultants on March 11, 2002, Plaintiff noted that his right hand side was doing better due to a joint injection, and indicated that he wished to have a similar injection for his left side.  [R. at 147].  The record indicates that Plaintiff received several such injections.  [R. at 147 - 56].  On May 20, 2002, during a visit with Tulsa Pain

Consultants, Plaintiff indicated that his pain was relatively well controlled on OxyContin, Lortab and the injections.  [R. at 144].  Plaintiff was to begin physical therapy.  [R. at 144]. Plaintiff was seen at Tulsa Pain Consultants on August 13, 2002.  Dr. Revelis noted that, in his opinion, Plaintiff had improved with physical therapy.  [R. at 142].  Plaintiff was seen at Tulsa Pain Consultants on January 21, 2003.  [R. at 138].  Plaintiff was described as a very pleasant man with bilateral hip pain.  Plaintiff had several sacroiliac joint injections over the past year and reported only temporary relief of his symptoms.  Plaintiff was stable on OxyContin, Ambien for sleep, and Lortab for occasional breakthrough pain with Baclofen for muscle spasm.  Plaintiff was oriented with movement in all four of his extremities.  [R. at 138].  Dr. Revelis noted that, at present time Plaintiff was at maximum medical improvement from a pain management standpoint and that Plaintiff would require long term medication to control his pain.  [R. at 138].  No follow-up appointment was made, but Dr. Revelis agreed to continue to manage Plaintiff's medications.  [R. at 138].

Plaintiff was evaluated by LDH Consultants, Inc. on a vocational evaluation on March 19, 2003.  [R. at 234].  The evaluator, Dorothy Woodruff, a rehabilitation consultant, concluded that due to Plaintiff's subjective complaints (relating to his inability to drive while taking narcotic medication) and Plaintiff's difficulties distinguishing numbers during testing, that she believed Plaintiff would be unable to fully apply himself while continuing on his current medication.  "[T]his consultant feels that he is totally disabled and unable to return to gainful employment."  [R. at 241].

After the hearing, Plaintiff obtained a Physical Residual Functional Capacity form from Dr. Revelis.  Dr. Revelis noted that Plaintiff had a failed fusion and suffered from chronic pain.  He noted that Plaintiff would require long-term medications, and noted that

he did not know whether or not Plaintiff could perform work necessary to complete an eight hour day.  [R. at 245].  The form was completed March 10, 2004.  [R. at 245].

Plaintiff testified at a hearing before ALJ Lantz McClain on March 11, 2004.  [R. at 246].  Plaintiff was born June 2, 1963, and was 40 years old at the time of the hearing before the ALJ.  [R. at 256].

Plaintiff is 6' tall, and stated at the hearing that his usual weight was about 180 or 190, but that he currently weighed 210.  [R. at 258].  Plaintiff graduated from high school, and attended carpentry class after high school.  [R. at 258].

At the time of the hearing before the ALJ, Plaintiff stated that he was attending a school to work on boat motors.  [R. at 258].  According to Plaintiff, his attendance at school has declined because he has had to lift items which were heavy and it has affected his back.  [R. at 258-59].  Plaintiff stated that he went to school eight hours each day, and initially made A's and B's, but was currently making D's due to the problems he was having with his back.  [R. at 259].

Plaintiff testified that the motors that he was lifting weighed from 25 to 75 pounds and he was unable to lift the motors without suffering the next morning.  [R. at 260].  Plaintiff can lift a gallon of milk, and believes he can lift ten pounds.  [R. at 261].  Plaintiff did note that he sometimes did not realize that what he was lifting was too much for him until it was too late because the medications that he is on are powerful.  [R. at 261].

Prior to his accident, Plaintiff worked as a carpenter.  Plaintiff noted that he was able to lift 100 pounds on his own and hang sheet rock.  Plaintiff was injured while working on the job in 1999 and was unable to perform carpentry work after his injury.  [R. at 262].  While Plaintiff was working, in February 1999, he left to pick up nails for the job and while

returning to the job a deer ran in front of his car.  Plaintiff swerved to avoid hitting the deer and hit a tree, totaling the truck.  [R. at 266].

Plaintiff has had two surgeries on his back.  [R. at 266].  Plaintiff continues to experience pain in his lower back.  Plaintiff stated that he was bruised, in the accident, from the top of his head to the bottom of his feet.  Plaintiff experiences numbness in his fingers and pain in his hands and legs.  Plaintiff states that his back feels as though a knife has been stuck in it.  [R. at 267].

Plaintiff believes he can walk about 100 yards during the day.  [R. at 268].  Plaintiff can sit about 30 to 35 minutes.  [R. at 268].  Plaintiff could stand for about 20 to 40 minutes.  [R. at 269].

Plaintiff's pain varies because he takes pain medication.  Plaintiff noted that he is learning to deal with his pain.  [R. at 269].

Plaintiff also testified that he drives 50 miles one way to school every day.  [R. at 273].  Plaintiff noted that he is concerned about his driving because of the numerous medications that he is taking.  [R. at 273].  Plaintiff did note that some of his tardies to school were because his medication had caused dizziness and when he laid down to relieve the dizziness he fell asleep and "they didn't wake" him up in time for class.  [R. at 273].  Plaintiff also noted that the school provided short breaks every hour and that was enough time for him to rest.  [R. at 274].

A Residual Functional Capacity Assessment form was completed on June 27, 2003 by Thurma Fiegel, M.D.  [R. at 158].  Plaintiff was assessed as able to occasionally lift 20 pounds, frequently lift ten pounds, stand or walk six hours in an eight hour day, and sit six

hours in an eight hour day.  [R. at 159].  This assessment was "affirmed as written" on

August 5, 2003.  [R. at 165].

## II. SOCIAL SECURITY LAW AND STANDARD OF REVIEW

The Commissioner has established a five-step process for the evaluation of social

security claims.  *See* 20 C.F.R. § 404.1520.  Disability under the Social Security Act is

defined as the

> inability to engage in any substantial gainful activity by reason
> of any medically determinable physical or mental impairment
> . . . .

42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Social Security Act only if his

> physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work in the
> national economy. . . .

42 U.S.C. § 423(d)(2)(A).[3/]

The Commissioner's disability determinations are reviewed to determine (1) if the

correct legal principles have been followed, and (2) if the decision is supported by

---

[3/]   Step One requires the claimant to establish that he is not engaged in substantial gainful activity (as defined at 20 C.F.R. §§ 404.1510 and 404.1572).   Step Two requires that the claimant demonstrate that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 1521. If claimant is engaged in substantial gainful activity (Step One) or if claimant's impairment is not medically severe (Step Two), disability benefits are denied.   At Step Three, claimant's impairment is compared with those impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings").   If a claimant's impairment is equal or medically equivalent to an impairment in the Listings, claimant is presumed disabled.  If a Listing is not met, the evaluation proceeds to Step Four, where the claimant must establish that his impairment or the combination of impairments prevents him from performing his past relevant work.   A claimant is not disabled if the claimant can perform his past work.  If a claimant is unable to perform his previous work, the Commissioner has the burden of proof (Step Five) to establish that the claimant, in light of his age, education, and work history, has the residual functional capacity ("RFC") to perform an alternative work activity in the national economy.  If a claimant has the RFC to perform an alternate work activity, disability benefits are denied.  *See* <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987); *Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

substantial evidence.  *See* 42 U.S.C. § 405(g); *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).

The Court, in determining whether the decision of the Commissioner is supported by substantial evidence, does not examine the issues *de novo*.  *Sisco v. United States Dept. of Health and Human Services*, 10 F.3d 739, 741 (10th Cir. 1993).  The Court will not reweigh the evidence or substitute its judgment for that of the Commissioner.  *Qualls v. Apfel*, 206 F.3d 1368 (10th Cir. 2000); *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  The Court will, however, meticulously examine the entire record to determine if the Commissioner's determination is rational.  *Williams*, 844 F.2d at 750; *Holloway v. Heckler*, 607 F. Supp. 71, 72 (D. Kan. 1985).

"The finding of the Secretary[4/] as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Substantial evidence is that amount and type of evidence that a reasonable mind will accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Williams*, 844 F.2d at 750.  In terms of traditional burdens of proof, substantial evidence is more than a scintilla, but less than a preponderance.  *Perales*, 402 U.S. at 401.  Evidence is not substantial if it is overwhelmed by other evidence in the record.  *Williams*, 844 F.2d at 750.

This Court must also determine whether the Commissioner applied the correct legal standards.  *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).    The

---

[4/]   Effective March 31, 1995, the functions of the Secretary of Health and Human Services ("Secretary") in social security cases were transferred to the Commissioner of Social Security.  P.L. No. 103-296.  For the purpose of this Order, references in case law to "the Secretary" are interchangeable with "the Commissioner."

Commissioner's decision will be reversed when he uses the wrong legal standard or fails to clearly demonstrate reliance on the correct legal standards.  *Glass*, 43 F.3d at 1395.

## III.  ADMINISTRATIVE LAW JUDGE'S DECISION

The ALJ found that Plaintiff retained the residual functional capacity ("RFC") to lift or carry ten pounds occasionally and up to ten pounds frequently.  Plaintiff's RFC included the ability to stand or walk (with normal breaks) at least two hours in an eight hour day and sit (with normal breaks) for at least six hours in a normal day.  [R. at 21].

The ALJ concluded that Plaintiff was unable to perform his past relevant work as a carpenter because it involved heavy work.  The ALJ found that Plaintiff was able to perform work in the national economy based upon the testimony of a vocational expert.  [R. at 22]. The ALJ concluded that Plaintiff was not disabled.  [R. at 22-23].

## IV.  REVIEW

**ALJ's RFC Evaluation**

Plaintiff initially asserts that the ALJ failed by failing to give appropriate weight to the opinions of Plaintiff's treating physicians.  Plaintiff initially references Dr. Sherburn and Dr. Revalis.  The ALJ does, however, specifically discuss both doctors.  The ALJ's decision contains a review of each of the doctor's treating notes, and observes that both of the doctors released Plaintiff with "no pronouncements of his total and permanent disability." The ALJ noted that Dr. Sherburn used the phrases "well healed" and "doing well" to describe Plaintiff's condition and indicated that Plaintiff should avoid heavy manual labor. [R. at 21].  Plaintiff suggests that the references of "well healed" and "doing well" was with regard to the outcome of Plaintiff's surgery and not an indication that Plaintiff's complaints

-- 12 --

were resolved.  However, as noted by the ALJ, none of Plaintiff's treating physicians placed permanent restrictions upon Plaintiff.  The ALJ's decision is not contradicted by the treating physicians.  The ALJ merely noted that the treating physicians did not permanently rate Plaintiff and that Dr. Sherburn indicated Plaintiff should avoid heavy manual labor.  The ALJ does, in his opinion, obviously credit some of Plaintiff's complaints because he places a ten pound lifting restriction upon Plaintiff.  However, the conclusions of the treating physicians does not dictate a finding of disabled.

Plaintiff additionally discusses the differing views of the doctors that rated Plaintiff for the purpose of workers' compensation.  Dr. Lee found a 21% impairment, with Dr. Martin stating Plaintiff was 100% economically disabled and unemployable.  The ALJ does note that the opinion of Dr. Martin appeared to contrast with the treating physician's opinion.  [R. at 21].  Plaintiff suggests that the ALJ did not sufficiently distinguish Dr. Martin's report.  However the ALJ noted that the treating physicians contrasted with Dr. Martin.  The ALJ additionally observed that Dr. Martin's opinion was conclusory and not entitled to controlling weight.  The ALJ accepted the conclusions of the treating physicians over the conclusory opinion of Dr. Martin.

Plaintiff suggests that the ALJ ignored the treating physician's opinions that Plaintiff would require ongoing pain management when making his RFC determination.  Plaintiff's argument is not supported by the record.  Plaintiff was undergoing his ongoing pain management and under treatment when Plaintiff was able to attend classes and drive to classes.  The ALJ's findings with regard to Plaintiff's RFC are primarily from Plaintiff's testimony and Plaintiff's attending classes.  These activities occurred while Plaintiff was taking the referenced medications.

**Credibility Assessment**

Plaintiff asserts that the ALJ improperly assessed Plaintiff's credibility.  Initially, Plaintiff references "boilerplate" language in the ALJ's opinion and asserts that absent a thorough analysis, mere boilerplate language is insufficient.  However, the existence of boilerplate language does not render the analysis itself insufficient.  Certainly an ALJ is free to include whatever boilerplate language, case law, and general requirements as are necessary, in the opinion of the ALJ, in the decision.  The boilerplate language is simply not considered as part of the ALJ's analysis of the particular claimant's credibility.

Plaintiff additionally dismisses the ALJ's analysis of Plaintiff's credibility.  Plaintiff notes that the ALJ "relies heavily on the fact that claimant has been driving and attending classes" to establish Plaintiff's capabilities to work.  The Court will not fault the ALJ for this.  Plaintiff testified that he drove 50 miles each way to school each day, and that he made A's and B's in school until he was required to lift heavy motors.  Certainly Plaintiff's ability to attend school, make good grades, and drive more than one hour in a car on a regular basis is support for the ALJ's findings with regard to Plaintiff's credibility.  The ALJ also noted that Plaintiff was at the school for eight hours per day, that Plaintiff indicated he could lift ten pounds, walk 100 yards, sit for 30 - 35 minutes and stand for 20 - 40 minutes.  [R. at 21].

Plaintiff suggests that the ALJ improperly relied upon Plaintiff's school attendance because Plaintiff missed approximately 12% of his classes which would translate into missing approximately 2.5 work days each month.  However, the ALJ relied upon the Plaintiff's testimony, and the ALJ noted that Plaintiff made A's and B's in the class, beginning to have difficulties with the curriculum and attendance when he was required to

lift the motors that weighed 25 - 75 pounds.  The ALJ's placement of a lifting restriction upon Plaintiff would preclude Plaintiff from lifting that amount of weight.

Plaintiff notes that the vocational rehabilitation evaluation found that Plaintiff could not persistently apply himself to a work situation.  The ALJ additionally addressed this report, noting that the findings in it were largely based upon the Plaintiff's subjective complaints, and that the consultant primarily relied upon Plaintiff's medications although the consultant had no apparent medical background.  The ALJ also noted that this report was contrary to Plaintiff's actual activities of regularly attending classes and driving.

The Court finds that the ALJ's discussion of Plaintiff's credibility is supported by substantial evidence.  The ALJ concluded that Plaintiff could lift or carry 10 pounds, stand or walk two hours in an eight hour day and sit for six hours with normal breaks.  [R. at 21]. Plaintiff testified that he could lift 10 pounds, sit for 30 - 35 minutes and stand for 20 - 40 minutes.  Plaintiff regularly drove 50 miles to class and participated in classes.  The record contains substantial evidence to support the ALJ's findings.

Dated this 15th day of May 2006.

Sam A. Joyner
United States Magistrate Judge